*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 13a0101p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT
_____

TANYA A. MARTIN, Administratrix of the
Estate of William Parker Martin,
                              *Plaintiff-Appellee,*

          *v.*                                         No. 11-4039

CITY OF BROADVIEW HEIGHTS; CITY OF
BROADVIEW HEIGHTS POLICE DEPARTMENT;
RYAN TIEBER, Officer; MICHAEL SEMANCO,
Officer; SCOTT ZIMMERMAN, Officer; ROB
NOVOTNY, Officer; ROBERT LIPTON, Chief;
STEVE KOPNISKE, Lt.; TIM SCARBROUGH,
Sgt.; JOHN DOE I THRU III,
                              *Defendants-Appellants.*

_____

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:08-CV-2165—Solomon Oliver, Jr., Chief District Judge.

Argued: October 4, 2012

Decided and Filed:  April 9, 2013

Before:  GUY, DAUGHTREY, and STRANCH, Circuit Judges.

_____

## COUNSEL

**ARGUED:** Frank H. Scialdone, MAZANEC, RASKIN & RYDER CO., L.P.A., Cleveland, Ohio, for Appellants.  S. Michael Lear, ZUKERMAN, DAIKER & LEAR CO., L.P.A., Cleveland, Ohio, for Appellee. **ON BRIEF:** Frank H. Scialdone, John T. McLandrich, MAZANEC, RASKIN & RYDER CO., L.P.A., Cleveland, Ohio, for Appellants.  S. Michael Lear, Larry W. Zukerman, ZUKERMAN, DAIKER & LEAR CO., L.P.A., Cleveland, Ohio, for Appellee.

―――――――――――

OPINION

―――――――――――

JANE B. STRANCH, Circuit Judge.  This excessive force case against officers of the Broadview Heights Police Department (BHPD) and the City of Broadview Heights arises from the fatal arrest of William Parker Martin, an unarmed and mentally unstable 19-year-old.  Martin's estate sued several BHPD officials asserting that the use of excessive force during the arrest violated Martin's rights under the Constitution and Ohio law.  The estate also sued the City under federal law for failing to train or supervise its employees.  The district court denied summary judgment to three officers on the basis of qualified immunity and state-law immunity, and to the City.  The officers and the City now appeal.  We hold that immunity does not shield the officers from liability in these circumstances.  And in the face of that conclusion, we lack jurisdiction to review the municipal-liability claim.  As a result, we **AFFIRM**.

## I.  BACKGROUND

William Parker Martin, a 19-year-old male, died in the early morning hours of August 16, 2007, minutes after BHPD Officers Ryan Tieber, Scott Zimmerman, and Michael Semanco physically restrained and arrested him.  (A fourth officer, Robert Novotny, was also on the scene but is not a party to this appeal because the district court granted summary judgment in his favor on all counts asserted against him.)  Shortly after 2:00 a.m., the officers responded to a dispatch call indicating that a male, wearing only jeans at the time, was yelling for help outside an apartment at 1000 Tollis Parkway.  On his way there, Tieber heard from dispatch that a resident at 8633 Scenicview Drive reported that a naked male entered a nearby apartment.

Approaching the Scenicview address, Tieber encountered a naked male, later identified as Martin, running towards his patrol car, speaking quickly and nonsensically. Martin momentarily calmed down and asked Tieber for help, placing his hands behind his back and insisting that Tieber take him to jail.  When Tieber grabbed Martin's hands

and reached for his handcuffs, Martin "jogged away." Tieber caught Martin before he got further than 20 feet, and fell on top of Martin with his abdomen to Martin's back.

Officer Semanco then arrived on the scene and, observing Martin trying to push himself up, dropped his knee into Martin's side to keep him on the ground. Semanco fell on top of both Martin and Tieber, and delivered one or two "compliance body shots" to Martin's side with his knee. During the struggle, Martin bit Tieber's knuckle. In response, Tieber struck Martin in the face with two "hammer punches," which, he later explained, are closed-fist punches that strike a target using the area between the fifth finger and the wrist. Semanco then used all of his force to strike Martin's face, back, and ribs at least five times. Meanwhile, Tieber folded his legs around Martin's hips and upper thighs, and gripped Martin's chin with his right arm. The estate introduced evidence suggesting his arm was wrapped around Martin's neck.

Martin was face down on the ground when Officer Zimmerman arrived. As Tieber and Semanco attempted to get Martin's arms behind his back, Zimmerman kneeled on Martin's calves to prevent him from kicking and assisted in handcuffing him. At the time of the incident, Tieber weighed approximately 180 pounds, Semanco approximately 185 to 195 pounds, and Zimmerman approximately 245 pounds. Martin was 5' 10" and weighed 172 pounds.

Officer Novotny showed up shortly before Martin was handcuffed. When Martin was secured, Novotny and Semanco left Martin with Zimmerman and Tieber, who continued to hold Martin in a face-down position.[1] The two officers soon heard Martin make a "gurgling sound." When they rolled Martin onto his side, he was unresponsive and exhibited no signs of life. The officers tried to resuscitate him and called for paramedics. At 3:06 a.m., Martin was pronounced dead.

---

[1]The officers vigorously dispute this. They maintain that the district court did not find that any of them put pressure on Martin's back after he was handcuffed. But Zimmerman's admission that he and Tieber continued to hold Martin down—Tieber with his hand and Zimmerman with his arm, "just to make sure [Martin] wasn't going to get up and try to run away"—flatly contradicts their assertion. Zimmerman's admission is relevant for another reason. In their briefs and again at oral argument, the officers faulted the district court for lumping Zimmerman's actions together with the other two officers. Zimmerman himself, though, admitted that he applied force to Martin's body after Martin was handcuffed. How much force was applied and for how long are disputed factual issues a jury must decide.

Martin's cause of death is disputed. Dr. Frank Miller, III, the Cuyahoga County Coroner, determined that Martin died from an acute psychotic episode with excited delirium due to intoxication by lysergic acid diethylamide (commonly known as LSD or acid) and cardiopulmonary arrest. Dr. Miller concluded the death did not result from the force applied to Martin's body.

Dr. Stanley Seligman, the forensic pathologist who conducted Martin's autopsy, found numerous injuries that suggested death by asphyxiation. Three months after the autopsy, Dr. Seligman's concern that Martin may have died as a result of asphyxiation while the officers restrained him led him to ask an investigator in the coroner's office to conduct another inquiry into Martin's cause of death. After the investigator produced his follow-up report, Dr. Seligman confirmed that the officers' actions during the arrest were "compressive events" that could have caused Martin's asphyxiation. He also documented scattered areas of soft tissue hemorrhage at the lowest part of the neck above the two collar bones, which he attributed to fingertip pressure consistent with someone grabbing Martin's neck. And he found that the gurgling noise Martin made indicated asphyxiation. Dr. Seligman concluded that the evidence pointed to asphyxia as the likely cause of death.

Dr. Werner Spitz, a pathologist hired by the estate, offered a similar opinion. He criticized the coroner's cause-of-death determination, stating that excited delirium is a controversial, unproven, and unrecognized theory from which no death has ever resulted. And he stated that physical manifestations on Martin's body—including injuries that suggested Martin was pulled backwards by the neck—"clearly support death by asphyxiation."

At the time of Martin's arrest, BHPD had in place two policies meant to guide the officers' conduct in situations such as this one. The first, a use-of-force policy, instructed the officers in the appropriate amount of force to use in a given situation. The second was a "Positional Asphyxia Policy" implemented in April 2003 to inform the officers of the dangers of asphyxiating an individual during a restraint procedure. The asphyxiation policy provides the medical definition of asphyxia, as well as its effects.

In a section entitled "High Risk Subjects," it describes conditions that may increase an individual's risk of death after being restrained,  warning that a person who is psychotic due to mental illness or the ingestion of drugs or alcohol may be particularly susceptible to death.  The policy further states:

> Many individuals who suddenly die after being restrained have exhibited bizarre, irrational, agitated behavior, including a violent struggle with officers who are trying to restrain them, often with what seems like superhuman strength.  This condition is sometimes referred to as Excited or Agitated Delirium.  It can result from the use of alcohol or drugs or from mental illness.

Officers Tieber and Semanco said they never considered this policy during Martin's arrest.  Semanco also offered that he did not think about whether Martin might be a high-risk subject under it.

Dr. R. Paul McCauley, the estate's police-practices expert, offered his opinion regarding the incident and BHPD's operational practices.  Dr. McCauley faulted BHPD for its failure to:  properly train officers with respect to the Positional Asphyxia Policy, properly investigate use-of-force violations, and instruct officers on how to deal with emotionally disturbed individuals.  Dr. McCauley concluded that if BHPD followed accepted police practices, Martin's death "more than likely" would have been avoided.

Tanya M. Martin, Martin's mother and the administratrix of his estate, filed suit against several BHPD officers and the City, pleading federal claims under 42 U.S.C. § 1983 and multiple state-law claims.  In their motion for summary judgment, the three officers involved in this appeal asserted qualified immunity as a defense to liability for the estate's federal claims and statutory immunity under Ohio law for the state-law claims.  The City argued that the estate could not show it violated Martin's rights.

The district court denied summary judgment to Officers Tieber, Semanco, and Zimmerman on the estate's § 1983 claim alleging unreasonable seizure and excessive force, concluding that the estate put forward sufficient facts and evidence to show that the officers' use of force was objectively unreasonable. The court also denied summary judgment to the City on the estate's negligent hiring, training, and supervision claim.

It found that the training the City provided on its use-of-force and asphyxiation policies was inadequate to prepare the officers for their confrontation with Martin. And the court determined that the estate presented enough evidence to raise a genuine issue of material fact regarding the City's deliberate indifference to Martin's rights. As to the state-law claims, the court held the officers were not entitled to statutory immunity as a matter of law because a reasonable jury could conclude that they acted with malice, bad faith, or recklessness when they restrained and placed excessive weight on Martin while he was face down. The officers and City appeal these rulings.

## II. ANALYSIS

### A. Qualified immunity

A district court's denial of qualified immunity is an appealable final decision under 28 U.S.C. § 1291 only "to the extent that it turns on an issue of law." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985). "Cases fitting that bill typically involve contests not about what occurred, or why an action was taken or omitted, but disputes about the substance and clarity of pre-existing law." *Ortiz v. Jordan*, 131 S. Ct. 884, 892 (2011).

We review the denial of summary judgment on the basis of qualified immunity de novo. *Morrison v. Bd. of Trs. of Green Twp.*, 583 F.3d 394, 399 (6th Cir. 2009). Summary judgment may be granted where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (internal quotation marks omitted). In considering the record, we "'view the facts and any inferences reasonably drawn from them in the light most favorable to the nonmoving party.'" *Griffith v. Coburn*, 473 F.3d 650, 655 (6th Cir. 2007) (quoting *St. John v. Hickey*, 411 F.3d 762, 768 (6th Cir. 2005)).

Qualified immunity protects public officials from liability for civil damages if their conduct does not violate "clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223,

231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). We follow a "two-tiered inquiry" to determine if an officer is entitled to qualified immunity. *Austin v. Redford Twp. Police Dept.*, 690 F.3d 490, 496 (6th Cir. 2012) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)). The first step is to determine if the facts alleged make out a violation of a constitutional right. *Pearson*, 555 U.S. at 232. The second is to ask if the right at issue was "clearly established" when the event occurred such that a reasonable officer would have known that his conduct violated it. *Id.*; *see also St. John*, 411 F.3d at 768. These two steps may be addressed in any order. *Pearson*, 555 U.S. at 236. But both must be answered in the affirmative for the case to go to a factfinder to decide if each officer's conduct in the particular circumstances violated a plaintiff's clearly established constitutional rights. If either one is not satisfied, qualified immunity will shield the officer from civil damages. *Id.*

The officers urge that their actions were objectively reasonable and contend that it was not clearly established in August 2007 that their conduct violated Martin's constitutional rights.

### 1. Constitutional violation

The Fourth Amendment protects against "unreasonable seizures" and guarantees citizens the right to be "secure in their persons." U.S. Const. amend. IV. Whether an officer's use of force in effecting an arrest violates the Fourth Amendment is a question of whether his actions are "'objectively reasonable' in light of the facts and circumstances confronting [him], without regard to [his] underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 388 (1989). The test is "reasonableness at the moment" force is used, "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396.

The court must carefully balance "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." *Id.* (internal quotation marks omitted). Three factors guide this balancing: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or

attempting to evade arrest by flight." *Id*. Though important, these factors are not the end of the matter, as the court ultimately must determine "'whether the totality of the circumstances justifies a particular sort of seizure.'" *St. John*, 411 F.3d at 771 (quoting *Tennessee v. Garner*, 471 U.S. 1, 8–9 (1985)).

Applying the first *Graham* factor, the severity of the crime at issue, the officers may have been justified in deploying some force against Martin. They responded to a disturbance call concerning a young man yelling for help, and subsequently heard a report that a naked male had entered an apartment and then left the area. So when Officer Tieber encountered a naked man making nonsensical statements and asking to be taken to jail, he may have reasonably concluded that using some force was necessary to apprehend a possible felony suspect. But the question is not whether any force was justified. It is, instead, whether Tieber—and, later, Semanco and Zimmerman—could reasonably use the *degree* of force employed against Martin.

In examining the second *Graham* factor—which focuses on the officers' conduct in light of any "immediate threat" Martin posed to their safety and that of others—we "must take into account" that the officers "had reason to believe that [Martin] was either on drugs or mentally unstable and they knew that he was unarmed." *Landis v. Baker*, 297 F. App'x 453, 465 (6th Cir. 2008) (citing *Deorle v. Rutherford*, 272 F.3d 1272, 1282–83 (9th Cir. 2001)). Martin was completely naked when he approached Tieber. If Tieber was not sure that Martin was unarmed as he drew near, this became apparent when Martin turned away from Tieber and put his hands behind his back to allow Tieber to handcuff him. From the first, Martin exhibited clear signs that he was distraught: he was unclothed, acting erratically, making incoherent statements, yelling for help, and asking to be taken to jail.

Tieber's response to this situation—tackling Martin and falling on top of him—was unreasonable. Dr. McCauley, the estate's police-practices expert, testified that instead of taking Martin down to the pavement when he did, Tieber should have initiated "verbal intervention" to calm Martin and allow time for back-up officers to arrive. Dr. McCauley concluded that a reasonable officer in this situation—faced with

an unarmed and distraught individual like Martin—would try to de-escalate the situation and reduce the level of force needed to gain control.

Instead, Tieber and his colleagues used severe force that did not match the threat Martin presented. After Tieber laid on Martin, belly to back, Semanco dropped his knee into Martin's side, fell on top of him, and delivered one or two "compliance body shots" to Martin's frame. Tieber then punched Martin twice in the face, and Semanco struck his face, back, and ribs at least five times. Tieber wrapped his legs around Martin's upper thighs, hips, and pelvis, and gripped Martin's chin or neck with his right arm.[2] Zimmerman kneeled on Martin's calves, helped cuff him, and used force to keep him down. Even after Martin was handcuffed and subdued, Zimmerman and Tieber used their arms to keep Martin in a face-down position, and did not roll Martin onto his side until he made a "gurgling" noise. In sum, the officers' response to the threat Martin posed to them or others was unreasonable.

The third and final *Graham* factor requires the court to weigh the officers' conduct against Martin's attempts to evade or resist arrest. Martin's resistance occurred in two discrete stages. The first was when he broke away from Tieber after initially surrendering and jogged about 20 feet before Tieber took him down to the ground. Tieber maintains he used the minimum force necessary to deal with Martin during this stage. But the mere fact that Martin tried to escape from Tieber's control does not justify the latter's conduct as a matter of law. *See Baker v. City of Hamilton*, 471 F.3d 601, 607–08 (6th Cir. 2006) (finding that a suspect's attempt to evade arrest by running two blocks from an officer did not preclude his claim of excessive force or justify the officer's subsequent baton strikes). And as a matter of police practices, Dr. McCauley opined that taking Martin down to the ground was unnecessary even after Martin "jogged away." Tieber's take-down and the force that followed was not a reasonable response to Martin's attempted escape.

---

[2]In addition to the opinions Drs. Seligman and Spitz offer to suggest that Tieber used his arm to hold Martin's neck, Dr. McCauley's statement that accepted police practice is to avoid all forms of choke holds unless deadly force is justified reinforces the conclusion that the officers used inappropriate force given the threat Martin posed.

The second stage of Martin's resistance occurred when he lay uncuffed on the ground with first one, then two, and finally three officers on top of him. The officers argue the district court failed to consider that Martin actively struggled while they tried to restrain him. We disagree. After properly taking the evidence presented in the light most favorable to the estate, the district court correctly held that the officers' conduct was unreasonable. This evidence fairly leads to an inference that Martin's physical movements were an attempt to gasp for air and escape the compressive weight of the officers on top of him, not an effort to fight with the officers or get away.

Two reasons support this view. First, the record evidence certainly points in this direction. The complaint, for example, alleged that Martin struggled to breathe under the officers' weight and "ultimately turn[ed] his body so that he was facing away from the ground." Dr. Spitz, the estate's medical expert, further corroborated this theory when he described Martin's "fear of impe[n]ding doom, as he was being pinned to the floor by the weight of two officers and held by the neck, unable to breathe, at a time when he was excited, stressed, and needed more air . . . to sustain his life." Second, to the extent the officers contend the force they used was reasonable merely because Martin offered *some* resistance before he was handcuffed, our precedents foreclose this line of argument. The Fourth Amendment's protections do not evaporate the moment an individual resists an officer's command. *See Lawler v. City of Taylor*, 268 F. App'x 384, 387 (6th Cir. 2008) (holding a jury could find an elbow jab and knee strikes amounted to excessive force against an arrestee who resisted being handcuffed while on the ground with an officer on top of him); *see also Baker*, 471 F.3d at 607 (observing that the fact that the arrestee was not handcuffed when he was struck did not preclude a finding of unreasonableness). In short, the force the officers used was not reasonably calculated to neutralize Martin's resistance.

The final step in our reasonableness inquiry is to ask "whether the totality of the circumstances justifie[s] a particular sort of . . . seizure." *Garner*, 471 U.S. at 8–9. Beyond the situational facts we have considered, our precedents require us to evaluate the officers' use of certain tactics "in light of testimony regarding the training that [the

officers] received in [them]." *Griffith*, 473 F.3d at 657.  BHPD's asphyxiation policy was implemented four years before this incident to "protect against an in-custody death and to recognize situations which would lead to positional asphyxia."  Each officer involved in the struggle reviewed the policy before August 2007.  The officers' awareness of a policy that warns of the boundaries of appropriate force with respect to the danger of positional asphyxia reinforces the conclusion that their conduct was unreasonable.

The bottom line is that a jury could find that the officers' conduct was unreasonable.  The officers used their weight to compress Martin, struck his head and body multiple times, restrained his neck or chin, and placed him in a torso lock.  These tactics were not justified by Martin's possible crime, the threat he posed to anyone's safety, or his resistance.  The officers' failure to adhere to a departmental policy that explained the grave dangers of positional asphyxia verifies the unreasonableness of their actions. The quantum of force the officers used was constitutionally excessive, violating the Fourth Amendment right of an unarmed, minimally threatening, and mentally unstable individual to be free from gratuitous violence during an arrest.

## 2.  Clearly established law

Having determined that the officers violated Martin's constitutional right, the next step is to consider whether that right was clearly established when the arrest occurred. *See Griffith*, 473 F.3d at 658–59 (citing *Saucier*, 533 U.S. at 202).  "If the law at that time was not clearly established, an official could not . . . fairly be said to 'know' that the law forbade conduct not previously identified as unlawful." *Harlow*, 457 U.S. at 818.  The right's contours must be "sufficiently clear" to show that "a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).  We have to zoom in close enough to ensure the right is appropriately defined:  instead of stating it "at a high level of generality," we "go down the stairs of abstraction to a concrete, particularized description of the right." *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012) (internal quotation marks omitted).  But not too close:

> [J]ust as a court can generalize too much, it can generalize too little. If it defeats the qualified-immunity analysis to define the right too broadly (as the right to be free of excessive force), it defeats the purpose of § 1983 to define the right too narrowly (as the right to be free of needless assaults by left-handed police officers during Tuesday siestas).

*Id*. at 508–09.

The task, then, is not to match each application of force with a precisely analogous case to demonstrate its prohibition. "The mere fact that a court has not held the particular action in question unlawful is insufficient to create immunity." *Griffith*, 473 F.3d at 659 (citing *Anderson*, 483 U.S. at 640). An action's unlawfulness may be plain "from direct holdings, from specific examples described as prohibited, or from the general reasoning that a court employs." *Champion v. Outlook Nashville, Inc.*, 380 F.3d 893, 902 (6th Cir. 2004) (internal quotation marks omitted). So while the contours of a right must be "sufficiently clear," *Anderson*, 483 U.S. at 640, a "fundamentally similar" or "materially similar" case is not required to show it is clearly established, *Hope v. Pelzer*, 536 U.S. 730, 741 (2002).

The sources of clearly established law to be considered are limited. We "look first to decisions of the Supreme Court, then to decisions of this court and other courts within our circuit, and finally to decisions of other circuits." *Champion*, 380 F.3d at 902 (internal quotation marks omitted). While these sources are the primary reference points, others may also light the path to reveal the existence of a clearly established constitutional right. *Id*. (observing that *Hope*, 536 U.S. at 744–45, looked to state regulations and communications between public agencies as evidence that the corporal punishment at issue in the case was clearly proscribed).

The prohibition against placing weight on Martin's body *after* he was handcuffed was clearly established in the Sixth Circuit as of August 2007. In *Champion*, we held that applying pressure to the back of a prone suspect who no longer resists arrest and poses no flight risk is an objectively unreasonable use of force. *Id*. at 901. Zimmerman and Tieber crossed the line *Champion* drew when they placed their arms on Martin's back to restrain him after he was handcuffed and prone.

The more difficult issue is whether the officers were on notice that the force they used against an unarmed and mentally unstable individual *before* he was subdued violated the Constitution. The officers argue that *Champion* is inapposite here because it only forbids creating asphyxiating conditions by putting substantial pressure on a handcuffed suspect's back. But this is too cramped a view of our precedents. The better view is that *Champion* proscribes the use of "substantial or significant pressure" that creates asphyxiating conditions in order to restrain a subject who does not pose a material danger to the officers or others. That Champion himself was handcuffed when this occurred is incidental to the rule.

An examination of the principal circuit court case on which *Champion* relies makes this clear. In *Simpson v. Hines*, ten officers entered the jail cell of a "volatile, drug-affected" detainee who refused to surrender his personal effects or be searched. 903 F.2d 400, 401 (5th Cir. 1990). An officer restrained Simpson's neck while others grabbed his arms and legs and brought him down to the ground. *Id*. at 402. An officer nicknamed "Beef" (due to his large size) sat on Simpson's chest as the others tried to handcuff him. Unable to do so, they rolled Simpson on to his stomach and double-cuffed his hands and legs. *Id*. The medical examiner's report stated that Simpson died due to asphyxiation minutes after the struggle. *Id*. Finding the officers should have known the force they used was "grossly disproportionate to the need," the Fifth Circuit denied them qualified immunity. *Id*. at 403. *Champion*'s reliance on *Simpson* shows that creating asphyxiating conditions by applying "substantial or significant pressure" to restrain a suspect who presents a minimal safety risk amounts to excessive force.

More recent Sixth Circuit case law bolsters this view. In *Griffith*, we considered whether restraining the neck of an unarmed and emotionally disturbed man during the course of an arrest in his home violated a clearly established constitutional right. The police offered disputed testimony that the man, Partee, resisted arrest and struggled with the officers as they attempted to handcuff him. They also claimed Partee tried to unholster an officer's gun during the struggle. This led an officer to restrain Partee's neck to gain control over him before handcuffing Partee and putting him face down on

the ground. Partee died from asphyxiation. Taking the facts in the light most favorable to Partee, we observed that he "posed no threat to the officers or anyone else." *Griffith*, 473 F.3d at 659. In these circumstances, the use of the neck restraint violated Partee's clearly established right to be free from gratuitous violence during arrest. *Id.* at 659–60.

Here, as in *Griffith*, Martin did not present a serious safety risk that justified the officers' use of force. The officers object that Martin actively fought with them to avoid being handcuffed. But we are bound to view the evidence in the light most favorable to the estate. The record here supports the inference that Martin struggled to cast the officers' weight from his back so he could breathe. Even assuming that Martin struggled to avoid being handcuffed does little to help the officers show that the prohibition on their conduct was not clearly established. Martin posed less of a threat to the officers here than Partee did when he allegedly attempted to unholster an officer's gun during the struggle in that case. Moreover, the events here occurred outdoors when Martin was completely naked. Unlike the officers in *Griffith*, who wrestled with Partee in his own home, the officers here could not reasonably fear that Martin would produce a weapon to use against them. *Griffith* put the officers on notice that using severe force, including a neck restraint, against an unarmed and minimally threatening individual *before* he was subdued violates the Constitution.

Further, the officers violated clearly established law that required them to take into account "the diminished capacity of an unarmed detainee . . . when assessing the amount of force exerted." *Champion*, 380 F.3d at 904. Martin exhibited conspicuous signs that he was mentally unstable. He was also unarmed. Confronted with such an individual, *Champion* required the officers to de-escalate the situation and adjust the application of force downward. Contrary to this command, the officers ignored Martin's diminished mental state and used excessive force to control him.

Finally, BHPD's Positional Asphyxia Policy regulated the conduct of the officers when they encountered Martin, instructing them to recognize the risks of restraining an individual exhibiting bizarre and agitated behavior. "Just as the Supreme Court determined that [state regulations] and the communications between [a state and a

federal agency] put the state on notice about what constituted cruel and unusual punishment, so too here the training these officers received alerted them to the potential danger of this particular type of excessive force." *Id.* (citing *Hope*, 536 U.S. at 744–45). Though they knew the hazards of the tactics they deployed against a high-risk individual, the officers failed to heed the policy's warnings.  This is further evidence that the officers were on notice that their conduct exceeded the bounds of permissible force.

To summarize:  Our precedents and BHPD's own policies clearly established in August 2007 that the force the officers used to restrain Martin was excessive.  A reasonable officer should have known that subduing an unarmed, minimally dangerous, and mentally unstable individual with compressive body weight, head and body strikes, neck or chin restraints, and torso locks would violate that person's clearly established right to be free from excessive force.  The Constitution does not countenance this level of force.  The officers are not entitled to qualified immunity.

## B.  *Monell* liability

The City also appeals the district court's denial of summary judgment on the estate's *Monell* claim.  The City maintains it cannot be liable under *Monell* absent an underlying constitutional violation.  Because we have found that the officers violated Martin's clearly established right under the Fourth Amendment, the City's argument is unavailing.

Moreover, in the face of a constitutional violation, we lack subject-matter jurisdiction to entertain an appeal of the municipal-liability claim because the only path to review the City's claim is foreclosed here.  "Although not appealable as a final decision under 28 U.S.C. § 1291, an appellate court can exercise pendent appellate jurisdiction on a § 1983 claim alleging municipal liability where the municipality's motion for summary judgment is inextricably intertwined with the qualified immunity analysis properly before the Court." *Lane v. City of LaFollette*, 490 F.3d 410, 423 (6th Cir. 2007) (internal quotation marks omitted).  A pendent appellate claim is "inextricably intertwined" with a properly reviewable claim on collateral appeal "only if . . . appellate resolution of the collateral appeal *necessarily* resolves the pendent claim as well."

*Mattox v. City of Forest Park*, 183 F.3d 515, 524 (6th Cir. 1999) (internal quotation marks omitted).

The officers' challenge to the denial of qualified immunity is not "inextricably intertwined" with the district court's summary-judgment ruling on the City's *Monell* liability. The officers' liability turns on whether the force they used to restrain Martin violated his clearly established constitutional rights. But the City's liability hinges on its failure to train and supervise the officers. Because resolution of the officers' interlocutory appeal does not *necessarily* determine the City's training and supervision obligations, we do not have jurisdiction to consider the City's municipal-liability appeal at this time.

## C.  State-law immunity

Finally, the officers argue that they are entitled to statutory state-law immunity and that the district court erred in denying summary judgment on this ground. Ohio law does not immunize the acts or omissions of officers done with "malicious purpose, in bad faith, or in a wanton or reckless manner." Ohio Rev. Code § 2744.03(A)(6)(b). The district court concluded that a jury could find that the officers were liable on this basis.

The officers rely solely on *Chappell v. City of Cleveland*, 585 F.3d 901 (6th Cir. 2009), to support their claim. But *Chappell* only says that officers may be entitled to state-law immunity if qualified immunity shields them from liability on federal claims. *Id.* at 915 n.3. Qualified immunity does not protect the officers here. As resolution of the state-law immunity issue is heavily dependent on the same disputed material facts as the excessive-force determination under § 1983, the district court properly denied summary judgment to the officers on the estate's state-law claims.

## III.  CONCLUSION

For the reasons stated above, we **AFFIRM** the judgment of the district court.